UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  07-60097-Cr-COHN
Magistrate Judge Snow

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| KEVIN COMPANION, | ) |
| | ) |
| Defendant | |
| _____ / | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
OBJECTIONS TO THE PRESENCE INVESTIGATION REPORT**

COMES NOW the United States, by the undersigned Assistant United States Attorney, and files this Response in Opposition to the Defendant's Objections to Presentence Investigation Report, stating:

**INTRODUCTION**

**The Charges, Plea Agreement, and Guilty Plea**

On February 22, 2007, defendant Kevin Companion ("Companion") was arrested pursuant to a criminal complaint which charged him with conspiring and attempting to possess with intent to distribute heroin, in violation of 21 U.S.C. §846, and with conspiring and attempting to commit extortion under color of official right, in violation of 18 U.S.C. §1951.  These charges arose out of a two-year FBI undercover investigation looking into corruption within the Hollywood (Florida) Police Department ("HPD").  This criminal complaint also named three other HPD officers as defendants: Jeffry Courtney ("Courtney"), Thomas Simcox ("Simcox"), and Stephen Harrison ("Harrison).

On April 25, 2007, pursuant to a written plea agreement resolving this matter,

Companion pled guilty to an Information charging him with conspiring to possess with intent to distribute more than one kilogram of heroin, in violation of 21 U.S.C. §846.  Under the terms of the plea agreement, the parties stipulated that the amount of heroin involved in the conspiracy was between 3 and 10 kilograms.  In addition, the parties agreed to recommend that the Court apply the three-level reduction for acceptance of responsibility.       **The Presentence Investigation Report ("PSI") and Advisory Guidelines Range**

The PSI applies the sentencing recommendations jointly made by the parties.  In addition, at ¶50, the PSI recommends a two level increase due to Companion's role as a manager/leader under §3B1.1(c), and also recommends that this Court increase Companion's offense level by another two levels pursuant to §3B1.3 based on his abuse of a position of trust.  The PSI concludes that the total offense level should be 35, with a resulting advisory Sentencing Guidelines range of 168-210 months in prison.

**The Defendant's Objections**

The defendant objects to the enhancements recommended in ¶50 of the PSI: the two level role enhancement; and, the two level increase due to his abuse of a position of trust.  In addition, Companion objects to not receiving a minor role reduction, and to not receiving a safety valve reduction.  For the reasons to be provided herein and at the sentencing hearing, the government urges the Court to overrule all of these objections and set the advisory Guidelines range as recommended in the PSI.

**Summary of the Government's Sentencing Recommendation**

The government agrees that the 168-210 month range set out in the PSI is the correct advisory Guidelines range for this Court to consider before it applies the 18 U.S.C.

2

§3553(a) factors to determine the defendant's sentence.  *See United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005) (sentencing court is required to first compute the advisory Guidelines range, and then apply the §3553(a) factors to determine the ultimate sentence).  In addition, as will be explained in more detail at the sentencing hearing, it is the government's position that after consideration of the §3553(a) factors, the appropriate and reasonable sentence for the heroin trafficking offense committed by this defendant – a veteran police officer who recruited and led this group of corrupt officers in a series of criminal episodes – is 168 months, the lowest end of the advisory Guidelines range.

## DEFENDANT'S OBJECTIONS TO THE PSI

### PSI ¶50 - Defendant Objects to the Two-Level Role in Offense Enhancement

The defendant objects to the PSI's recommendation that he receive a two level enhancement under Guidelines §3B1.1(c) due to his role as a leader/manager/supervisor. His objection is based on a claim that Companion's role must be considered against the scope of the fictional criminal organization which the undercover agents purported to represent.  This objection is both legally and factually unfounded, and it should be overruled.

The evidence in this case clearly supports the recommended two-level increase based on Companion's role as a leader, manager, and supervisor of the criminal activity detailed in the PSI and guilty plea proffer.  Early on, when the UCAs told Companion they were interested in securing the services of additional police officers to protect and facilitate their illegal activities, it was Companion who identified, recruited, and supervised the three other corrupt officers – Courtney, Simcox, and Harrison – who joined in these various illegal

activities, culminating with the heroin delivery escort.  Throughout this series of criminal episodes, Companion played a supervisory role, including handling the contacts with the UCAs, receiving the largest share of criminal payments, and helping to set the lesser amounts that the other officers would be paid for their criminal activities.

### The Requirements for a Two-Level Increase Under §3B1.1

Section 3B1.1(c) of the Sentencing Guidelines provides for a two-level role in the offense increase if the defendant was an organizer, leader, manager, or supervisor of criminal activity involving less than five participants.  Because this is a sentencing enhancement, the government bears the burden of proving its application by a preponderance of the evidence.  *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007); *United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999).

To apply this enhancement, the defendant need only have asserted control or influence over one participant.  *United States v. Jiminez*, 224 F.3d 1243, 1251 (11th Cir.2000).  And, Application Note 1 to §3B1.1 expressly states that a participant must be a person who is criminally responsible for the commission of the offense; in contrast, an undercover agent is not a participant for purposes of a Guidelines role adjustment (up or down).  *See United States v. Costales*, 5 F.3d 480, 486 (11th Cir. 1993) (participants are only those involved in criminal activity, not undercover agents or innocent enablers); *see also United States v. Watkins*, 477 F.3d 1277, 1280 (11th Cir. 2007) (Guidelines make it clear that undercover agent not participant for purposes of role adjustment).

In determining if the enhancement applies, this Court also should consider the factors set forth in Application Note 4 to Section 3B1.1, including (i) the defendant's exercise of decision-making authority, (ii) the nature of the defendant's participation in the

offense, (iii) the recruitment of accomplices, (iv) the nature and scope of the illegal activity, and (v) the degree of control and authority exercised over others.  Another factor to assess is the receipt of a larger share of criminal proceeds.  All of these factors strongly support the PSI's recommendation that Companion receive this two level role enhancement.

As a starting point, Companion cannot contest that he recruited the other three participants to assist the purported organization in its criminal activities.  As the PSI details at ¶16, Companion met with the UCAs who explained that they needed additional police manpower, including the use of a marked police car, for illegal activities.  Companion expressed interest, and he recruited Courtney to participate in protecting a sale of stolen diamonds and the delivery of $400,000 in cash proceeds (PSI at ¶¶17-20).  The selection and recruitment of Courtney was done solely by Companion.

Companion then recruited two other officers – Simcox and Harrison – as well as Courtney to help him provide security for an illegal high-stakes card game in November 2005 (PSI at ¶¶24-28).  Continuing on, Companion was the contact to bring these other officers into the criminal ventures proposed by the UCAs, arranging to have Courtney and Simcox drive stolen diamonds to Atlantic City (PSI at ¶¶29-31), and enlisting Courtney, Simcox, and Harrison to provide protection for the theft and transportation of a tractor trailer load of cigarettes on April  7, 2006 (PSI at ¶¶32-35).  He also arranged to have Harrison accompany him while delivering stolen artwork to Atlantic City (PSI at ¶¶36-38), and of course, he was the one who brought in Courtney, Simcox, and Harrison into the multi-kilogram heroin transportation and delivery escort proposed by the UCAs which was the culmination of this matter (PSI at ¶¶40-47).

In addition to recruiting the other participants, Companion also played a significant

and supervisory role throughout.  He was the participant who handled the contacts between the UCAs and the other officers, and he also played a role in approving and setting the payments to the other participants.  For example, in the stolen diamond delivery (PSI at ¶¶29-31), Courtney and Simcox were required to drive the stolen diamonds from Florida to Atlantic City, while Companion flew to Atlantic City to meet them and oversee the turnover to the UCAs.  In similar fashion, Companion plays the leading role throughout, culminating in the heroin escort, where he had the initial meetings with the UCAs and plays a significant role in planning the execution of the offense.  And, the payment amounts also reflect Companion's leadership role among the four participants.  He also was the highest paid participant in each of these illegal transactions.

Companion's extensive involvement in the heroin trafficking offense (PSI at ¶¶40-47) also supports the two level role enhancement.  He alone was at the first meetings where the heroin deal was raised by the UCAs.  And, his extensive involvement was demonstrated most clearly by his leading role in the November 29, 2006 final planning session that involved Simcox, Companion, Courtney, Harrison, and the UCAs.  During this meeting, Companion and his fellow corrupt officers take the lead in deciding how the delivery and escort can best be carried out to avoid interference or detection.

Companion and the other officers discuss how they will have the driver pull off the highway and into a gas station just before arriving at Oakwood Plaza to try to expose any law enforcement surveillance, and how this will expose anyone following.  They also explain that they will have the driver stay at the gas station to give time for Simcox and Courtney to drive through the plaza to give extra assurance (on top of Harrison's observations) that everything looks clear.  In addition, the officers go on to discuss how

6

they will actually do the escort, explaining that they will use a "leap frog" technique, taking turns watching the driver so that their escort will not be obvious to anyone observing them. Finally, they discuss how they will secure the transfer area in the plaza, sealing it off from any possible observation or interference, before continuing on to escort the UCA trucker heading north with what was represented to be the load of heroin.

Companion's conduct is exactly the type of conduct which is covered by the two level role enhancement under Guidelines §3B1.1(c).  *See e.g. United States v. Harrison*, 189 Fed. Appx. 866, 868 (11th Cir. 2006) ("By recruiting his codefendants and assisting them in obtaining the drugs used to carry out the offense, Harrison played a managerial role in the offense and he exercised supervision over participants in it"); *United States v. Vallejo*, 297 F.3d 1154, 1169 (11th Cir. 2002) (affirming finding that defendant was organizer or leader where he gave orders to others involved in conspiracy, was involved in making important arrangements, and co-conspirator identified him as a boss); *United States v. Cruz-Natal*, 150 Fed.Appx. 961, 965-66 (11th Cir. 2005) (upholding leader/organizer enhancement where defendant was involved in recruiting members of conspiracy and directing some of their actions); *United States v. Poirier*, 321 F.3d 1024, 1036 (11th Cir. 2003) (reversing district court's failure to give role enhancement where trial evidence established that defendant supervised another participant and authorized that participant to make a bribe payment).  *United States v. Castillo-Valencia*, 917 F.2d 494, 501 (11th Cir. 1990) (defendant was one of many on drug boat; leadership role based on him being the one to wave off the Coast Guard).

Taken as a whole, the evidence in the record is more than sufficient to establish by a preponderance of the evidence that the defendant was an organizer and leader of this

criminal activity.  As a result, the PSR properly recommends a two-level enhancement, and the defendant's objection to paragraph 50 should be overruled.  Moreover, because he should receive this role enhancement, he is not eligible for a safety valve reduction, and his objection on this point also should be overruled.

### PSI ¶50 - Defendant Objects to Not Receiving Minor Role Reduction

Companion claims that he should receive a minor role adjustment because he was merely a "'lookout' for a complex criminal enterprise" involved in crimes including drug trafficking.  The heart of his argument is based on his comparison of Companion's role to the supposed role of the undercover agents in this case.  The defendant's objection is both legally and factually meritless, and it should be summarily overruled since the defendant cannot satisfy his burden of proof on this issue, which has the potential to have a very serious impact on the computation of the advisory Guidelines sentencing range.[1]

The defendant cannot meet his burden because Companion did not play a minor role, either looked at alone or in comparison to the other three participants.  To the contrary, Companion clearly played an integral and essential leadership role in the planning, execution, and attempted concealment of this offense, which was protecting the transportation of what was represented to be a multi-kilogram shipment of heroin.

### The Law Governing Minor Role Adjustments

As a starting point, it is settled law that the defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled to a minor role reduction.  *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007); *United States v. Boyd,* 291

---

[1] Under Guidelines §2D1.1(a)(3), if the defendant receives a mitigating role adjustment, then he also receives an additional three-level decrease in his base offense level.  Thus what the defendant is really seeking with his one sentence objection is a totally undeserved five level reduction in his offense level.

F.3d 1274, 1277 (11th Cir. 2002); *United States v. Ryan*, 289 F.3d 1339, 1348 (11th Cir.

2002); *United States v. Rodriguez de Varon*, 175 F.3d 930, 939 (11th Cir. 1999) (*en banc*).

"Minor-role reductions are to be given infrequently.  *United States v. Norton*, 176 Fed.Appx.

992, 995 (11th Cir. 2006) (*citing United States v. Costales*, 5 F.3d 480, 486 (11th Cir.

1993).

In the Eleventh Circuit, a mitigating role request is evaluated within the two-step

framework established by *United States v. Rodriguez de Varon* and its progeny.  This

process was recently summarized by the Eleventh Circuit in *United States v. Boyd*:

> First, the district court must assess whether a defendant's
> particular role was minor in relation to the relevant conduct
> attributed to him in calculating his base offense level.  *De
> Varon*, 175 F.3d at 941.  "Only if the defendant can establish
> that she played a relatively minor role in the conduct for which
> she has already been held accountable – not a minor role in
> any larger criminal conspiracy –" may a downward adjustment
> be applied.  *Id*. at 944.  The second prong of the analysis, if
> reached, requires the district court to assess a defendant's
> relative culpability vis-a-vis that of any other participants.  *Id*.

289 F.3d at 1348-49.  Companion's objection fails to satisfy either prong of the *De Varon*

analysis: he was not a minor participant in relation to the relevant conduct attributed to him

to establish his base offense level; and, he is not "substantially less culpable" than the other

three participants in this offense.

Applying this analytical framework, a defendant may receive a two-level reduction

as a minor participant only if he proves that he was "substantially less culpable than the

average participant" in that criminal activity.  Guidelines §3B1.2(b), §3B1.2, App. Note 3(A).

And the Guidelines specifically state that "participants" are only those persons who are

criminally responsible for the offense; undercover agents are not "participants" for

determining whether a defendant played a minor role.  §3B1.2, App. Note 1 (referencing

§3B1.1, App. Note 1).  *United States v. Costales*, 5 F.3d at 486; *United States v. Watkins*, 477 F.3d at 1280.

Accordingly, in considering whether Companion has proven that he played a minor role, his conduct is only compared against the conduct of Courtney, Simcox, and Harrison, and not against the undercover agents or their purported criminal organization.  In this context, Companion clearly was not entitled to a minor role adjustment.

### Companion Is Not Entitled to a Minor Role Reduction

Looking at the first prong of the *De Varon* test, Companion has not proven that he played a minor role in connection with the protection of the purported heroin delivery that establishes his base offense level.  The offense to which Companion pled guilty was a drug trafficking conspiracy based on providing a protection escort for the transportation of a multi-kilogram shipment of heroin.  As this was an undercover operation, there was no other action which companion and his three fellow corrupt officers were to take in connection with this purported heroin, and there were no other participants in the offense. The crime was completed when they ended their escort of the undercover truck as it headed into northern Broward County.  Accordingly, Companion role in the offense is determined by looking at the part he played in this protection escort.  And, as was explained regarding the role enhancement, a review of the facts and circumstances surrounding this heroin escort establishes that Companion played an essential and integral leadership role in the planning and execution of this offense.

Companion also cannot satisfy the second prong of *De Varon* because the record shows that he was not "substantially less culpable" than the three other participants.  Quite to the contrary, he was the most culpable of the participants.

**Defendant's Cases Are Inapplicable and Unpersuasive**

The defendant cites five cases which he claims support his request for a minor role reduction. A review of these decisions – four of which are from outside the Eleventh Circuit – reveals that they are both inapposite and unpersuasive. The only Eleventh Circuit decision cited by the defendant is *United States v. Ard*, 731 F.2d 718 (11th Cir. 1984), which is totally irrelevant because it is a pre-Guidelines decision dealing solely with the sufficiency of the evidence.

The other four decisions cited have no application in this case because they involved analyzing the role of very limited players in large drug organizations which had numerous participants as that term is used in the Guidelines. For example, in *United States v. Avila*, 1992 WL 75236 (9th Cir. 1992), the organization at issue was a massive cocaine distribution and sale organization spanning from Los Angeles to Idaho, while in *United States v. Perez*, 321 F.Supp.2d 574 (S.D.N.Y. 2003), the case involved a large crack dealing organization, and the decision seemed driven by the sentencing court's concern over the heightened severity of the Guidelines as they applied to crack cocaine. In contrast to these decisions, this case involved only four participants, and Companion played the leading role among those participants.

In summary, Companion has not, and cannot, satisfy his burden of proving that he played a minor role in this offense. As a result, this objection should be overruled. §3B1.2.

**PSI ¶50 - Defendant Objects to Abuse of Position of Trust Enhancement**

Guidelines §3B1.3 provides a two-level enhancement if the defendant abused a position of public trust "in a manner that significantly facilitated the commission or concealment of the offense." For this enhancement to apply, the government must prove

11

two facts by a preponderance of the evidence: first, that the defendant held a position of trust; and second, that the defendant's position of trust was used or contributed in some significant way to facilitating the commission or concealment of the offense, including by making the detection of the offense more difficult.[2]

### As a Police Officer, Companion Held a Position of Public Trust

As a starting point, it cannot be disputed that Companion, a police officer at the time of his crimes, held a position of trust within the meaning of §3B1.3.  The Eleventh Circuit has regularly upheld the abuse of trust enhancement for police officers.  *See e.g. United States v. Frost*, 61 F.3d 1518, 1529 (11th Cir. 1996); *United States v. Terry*, 60 F.3d 1541, 1545 n.4 (11th Cir. 1995); *United States v. Clark*, 989 F.2d 447, 449 (11th Cir. 1993).  In addition, numerous courts of appeal have specifically held that police officers hold a position of public trust.  *United States v. Williams*, 25 Fed.Appx. 175, 179 (4th Cir. 2002); *United States v. Williamson*, 53 F.3d 1500, 1525 (10th Cir. 1995); *United States v. Parker*, 25 F.3d 442, 450 (7th Cir. 1994); *United States v. Rahal*, 940 F.2d 1, 5 (1st Cir. 1991); *United States v. Foreman*, 926 F.2d 792, 796 (9th Cir. 1990).

### Companion Used His Position to Significantly Facilitate the Offense

The mere fact that Companion held a position of trust as a police officer does not satisfy the proof needed to apply this enhancement.  It must also be shown that he used his position of trust to significantly facilitate this offense.  As will be explained, the facts and circumstances of this case establish by a preponderance of the evidence that Companion

---

[2] As with the role enhancement, the government bears the burden of proving, by a preponderance of evidence, the facts necessary to support the abuse of trust enhancement.  *United States v. Perez-Oliveros*, 479 F.3d at 783; *United States v. Askew*, 193 F.3d at 1183.

used his position as a police officer (including the knowledge, experience, information, and equipment gained therefrom) to significantly facilitate the commission and concealment of a course of criminal conduct that culminated in the heroin delivery escort.

Before focusing on the specific ways in which Companion used his police position to significantly facilitate the heroin offense, it is important to set the context by looking at how he abused his position of trust in the other criminal episodes set out in the Offense Conduct section of the PSI. This context is illuminating because from the beginning of his association with the UCAs, this defendant was using – and thus abusing – his position as a police officer to further their criminal ventures for his own illegal personal gain.[3]

For example, in connection with protecting the collection of the illegal gambling debt (PSI at ¶14), Companion used his police experience to warn the UCA to be wary of a possible federal money sting. And, after the debt was collected, Companion and the UCA went to Companion's official HPD unmarked vehicle (which he had driven to the collection site), where the UCA counted the money and paid Companion $600 in cash for his services. In similar fashion, Companion used his official HPD unmarked vehicle to provide perimeter security for the UCA's sale of stolen watches (PSI at ¶15). Thus, right from the beginning, Companion was using his police knowledge, experience, and equipment to further his illegal activities.

During the stolen diamond sale (PSI at ¶¶17-20), Companion used his expertise to take the lead in providing security for what he was told would be a sale of stolen diamonds. And, he arranged to secure Courtney's services, having him in uniform and riding on his

---

[3] Due to the limited response time, only selected examples are provided. These will be supplemented at sentencing if the Court needs more information on this issue.

marked HPD motorcycle to escort the delivery of the "proceeds" of this sale, ready to intervene if local police officers interfered.  In connection with the delivery of stolen bearer bonds (PSI at ¶¶21-23), Companion stated that if pulled over on the way to New York City, he and Courtney would "badge" themselves out of the situation.  As part of providing security for the illegal high-stakes card game (PSI at ¶¶24-28), Companion stated that he had brought flex cuffs with him, and also discussed that Simcox had a metal detecting wand he would use to check the players.  And, when Companion and Harrison met with a UCA to pick up the stolen artwork which they were transporting to Atlantic City (PSI at ¶¶36-38), Companion explained to the UCA that he was going to bring along police property receipts to use as a part of a cover story if they were stopped by police en route.

This is the background leading up to the ultimate heroin transportation escort planned and executed by Companion and his fellow corrupt officers.  At the time of this heroin offense, Companion was a 22-year veteran of the HPD, and he brought to the planning and execution of this offense a wealth of specialized knowledge, information, and experience not available to a civilian, or even to a less experienced police officer.  And, the evidence in this case also shows that Companion made use of this specialized knowledge, information, and experience to help plan this crime so as best to avoid detection by law enforcement or interference by other criminals.

An example of Companion's abuse of his access to police information is found in his October 26, 2006 meeting with the UCAs where this drug escort was first discussed. During that meeting, Companion warned the UCAs to be aware of possible police aerial surveillance, explaining that Simcox had told him how the police follow people in helicopters.

Companion's abuse of his police position was demonstrated clearly during the November 29, 2006 final planning session that involved Companion, Courtney, Simcox, Harrison, and the UCAs.  During this meeting, Companion and his fellow officers used their police experience and knowledge to plan the execution of the delivery and escort to avoid interference or detection.  For example, Companion and his fellow officers discuss how they will have the driver pull off the highway and into a gas station just before arriving at Oakwood Plaza to try to expose any law enforcement surveillance.  The officers also explain that they will have the driver stay at the gas station long enough to allow Simcox and Courtney to drive through the plaza to give extra assurance (on top of Harrison's observations) that everything looks clear.

In addition, Companion and the other officers discuss how they will actually do the escort, explaining that they will use a "leap frog" technique, taking turns watching the driver so that their escort will not be obvious to anyone observing them.  And, they explain how they will secure the transfer area in the plaza, sealing it off from any possible observation or interference, before continuing on to escort the UCA trucker heading north with what was represented to be the load of heroin.  All of this exemplifies Companion's use, and thus abuse, of his police experience, knowledge, and training to facilitate this offense.

Finally, since the transfer of drugs was taking place at the Oakwood Plaza in Hollywood, Companion's position and experience as an HPD officer was even more valuable since he would be able to identify other HPD officers who might be in the vicinity, including those working undercover or off-duty, or even those who might simply be shopping at the plaza.  A civilian (or even a police officer from another jurisdiction) would not have this valuable special knowledge, and this enhanced ability to identify law

15

enforcement officers who might be at or near the crime scene (knowledge gained only from his position of trust as an HPD police officer) was an asset which could contribute to successfully completing and concealing this offense.

A review of decisions addressing this issue illustrates that Companion's conduct constituted "significant facilitation" of the offense for purposes of §3B1.3.  For example, in *United States v. Terry*, a case involving drug sales to an undercover agent, the Eleventh Circuit upheld the abuse of trust enhancement for a police officer (Terry) who on one occasion was in uniform and drove his marked unit by the scene of a meeting between a co-defendant and an undercover agent.  The Court stated that "[w]e hold that by being at the scene in his patrol car and by monitoring the radio, Terry was able to monitor police traffic and ensure that no other officers interrupted the transaction.  By doing these things, Terry facilitated both the commission and concealment of the crime . . ."  60 F.3d at 1545.

*United States v. Frost* involved a mayor, police chief, and police major who conspired to blackmail a city council member with a videotape made with a police department camera.  The Eleventh Circuit upheld the abuse of trust enhancement, pointing out that they had conspired together "using knowledge and resources available as a result of their positions of trust as police officers and as Mayor, to commit and attempt to conceal the crimes of which they were convicted.  61 F.3d at 1529.

The same rationale was applied in *United States v. Brenson*, 104 F.3d 1267, 1287 (11th Cir. 1997), where the abuse of trust enhancement was upheld for a grand juror who leaked information about an ongoing investigation.  The Eleventh Circuit stated that "[i]n applying §3B1.3, the court should inquire as to whether or not the defendant used any special knowledge or access provided by his position of trust to facilitate or conceal the

16

offense."  104 F.3d at 1287.

Numerous decisions from other circuits agree that this enhancement should apply where a police officer in any way uses knowledge, experience, and/or access which he has gained as a result of his position to further the commission or concealment of crimes by himself or others.  For example, in *United States v. Williamson*, one of the defendants (Dryden) was a police officer assigned to traffic duty whose sentence was enhanced because he used his knowledge and access to information to help a drug operation avoid detection by law enforcement.  The Tenth Circuit upheld the enhancement, stating:

> The mere fact that he was a traffic officer, rather than a vice officer, does not vitiate the fact that he used his special access to warrant information and his potential knowledge of undercover officers in a conscious and concerted attempt to conceal and protect the illegal activities of Mr. Marshall's organization.  This is "precisely" the type of conduct that the enhancement under §3B1.3 was designed to cover, and we therefore reject Mr. Dryden's claim of error.

53 F.3d at 1525 (citation omitted).

In *United States v. Rahal*, the First Circuit used the same rationale to uphold the enhancement for a police officer who alerted a target that he was under DEA investigation. The Court found that "the sentencing court reasonably concluded that appellant used his familiarity with the investigative techniques used in narcotics investigations to conceal his own activities and avoid detection.  We believe this is precisely the type of situation contemplated by §3B1.3 . . ."  940 F.2d at 5-6.  The Seventh Circuit took a similarly expansive view of the abuse of trust enhancement, holding in *United States v. Parker* that it would be justified even if the police officer defendant "had done no more than provide his co-conspirators with police response times and a police scanner . . . "  25 F.3d at 450.

In summary, the evidence clearly establishes that Companion abused his position

of trust to significantly facilitate this offense.  He used the special knowledge, experience, access to information, and skill which he acquired as an HPD officer to help plan and execute this heroin escort and delivery.  This included using surveillance and counter surveillance techniques learned and developed as a police officer to both avoid detection, and to spot other law enforcement officers who might be using these methods against them.  And, it also allowed him (and his three fellow corrupt officers) to have an extra advantage in spotting any other HPD officers who might be watching them or otherwise be at the Oakwood Plaza.  Companion's use of knowledge, experience, and information gained from his position as an HPD officer is exactly the type of conduct covered by §3B1.3, and his objection to the abuse of trust enhancement should be overruled.

## CONCLUSION

WHEREFORE, the United States, for the reasons set forth herein, respectfully requests that this Court deny the defendant's objections to the PSI.

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By:  s/ Edward N. Stamm
     Edward N. Stamm (Fl. Bar No. 373826)
     Assistant United States Attorney
     Senior Litigation Counsel
     99 Northeast 4th Street
     Miami, Florida 33132-2111
     Tel: (305) 961-9164
     Fax: (305) 536-4675

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 19, 2007, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

s/ Edward N. Stamm
Edward N. Stamm
Assistant United States Attorney